UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NAWAR RAAD GATTAH,

                   Plaintiff,         Civil Action No. 17-cv-14152
                                                 Honorable Paul D. Borman
v.                                                Magistrate Judge David R. Grand

COMMISSIONER OF SOCIAL SECURITY,

                   Defendant.
_____/

**REPORT AND RECOMMENDATION TO GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [14-1] AND DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [15]**

Plaintiff Nawar Raad Gattah ("Gattah") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (Docs. #14-1, #15), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.    RECOMMENDATION**

For the reasons set forth below, the Court finds that substantial evidence does not support the Administrative Law Judge's ("ALJ") conclusion that Gattah is not disabled under the Act. Accordingly, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment (**Doc. #15**) be **DENIED**, Gattah's Motion for Summary Judgment (**Doc. #14-1**) be **GRANTED IN PART** to the extent it seeks remand, and **DENIED IN PART** to the extent it seeks an award of benefits, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.

## II.   REPORT

### A.   Background

Gattah was born on March 19, 1988 in Iraq, but has been living in the United States for the past 10 years, and has become a naturalized U.S. citizen. (Tr. 40, 42, 140). He lives with his parents, and he does not help out around the house, except for occasionally taking the garbage out. (Tr. 43). Gattah testified that he stays at home most of the time, watching T.V., because he is scared to go outside. (*Id.*). Although he watches T.V. most of the time, he does not pay attention to what he is watching. (Tr. 50). He does not own or know how to use a cell phone. (Tr. 50). He testified that he uses a computer once a week with his brother's assistance, but he is not permitted to use it alone. (*Id.*). Gattah does not have a driver's license, nor does he have any hobbies or activities on a regular basis. (Tr. 47-48). Although Gattah enrolled in ninth grade in the United States, he testified that he did not pass. (Tr. 41). He also attempted to work as a grocery store bagger, but he was fired because he "didn't know how to stack things in the back." (Tr. 44). Gattah applied for SSI benefits on December 5, 2014, when he was 26 years old. (Tr. 140-48, 160). Initially, Gattah alleged disability due to post traumatic stress disorder (PTSD), apparently related to times when he was exposed to the violence of war while living in Iraq. (*Id.*).

Gattah has a unique set of medical records, which include treatment notes from Dr. Riyadh Kashima, M.D., which Gattah correctly labels "illegible," and recent mental health treatment notes from Eastwood Clinics, spanning November 5, 2015 through August 1, 2016. (Tr. 268-73, 286-309, 315-17). On February 27, 2015, Gattah underwent a consultative examination with Dr. Himaja Gummadi, M.D. (Tr. 287-288). Dr. Gummadi wrote that Gattah "was unable to communicate in English fluently. He could only communicate in single words as a response to quests," so a translator was used for the evaluation. Dr. Gummadi further opined Gattah had

2

"significant difficulty understanding, retaining and following instructions. Due to his depression with cognitive limitations, as well as language difficulty, he would have difficulty working in an environment where he needs to interact with people," and "[Gattah] is not able to manage the benefit funds." (Tr. 285-86). On April 29, 2015, Dr. Nick Boneff, Ph.D, administered a mental status exam, and an IQ-psychological testing for mental retardation. (Tr. 290-92). Dr. Boneff's examination yielded a full-scale I.Q. score of 42. (Tr. 291). Dr. Boneff opined that Gattah "appeared to put forth adequate effort on the testing," and, as a result, noted his "impression is that today's results do represent a valid and accurate measure of his current intellectual functioning." (Tr. 290). On July 24, 2015, the Cooperative Disability Investigations Unit (CDI) produced a report of its investigation into Gattah's application, as "GATTAH showed numerous limitations at examinations that do not appear to be supported by other evidence in file." (Tr. 194). He also "reported going to Southfield High School in Special Education, but they had no Special Education records available." (Tr. 193). However, the CDI investigation was largely in Gattah's favor. CDI noted, "during the interview, [ ] GATTAH had excessive salivation around his mouth. He stood with odd posture. GATTAH did not make eye contact. When asked questions, he would look away, look at his brother, or ask that the question be repeated. [ ] He had difficulty maintaining focus and concentration. GATTAH could understand English and speak it but could not formulate proper sentences." (Tr. 198). CDI then concluded, after interviewing Gattah, along with his housing manager and brother, that the preponderance of the evidence did not show fraud or similar fault.

Gattah's application was denied initially on August 28, 2015, and he timely requested a hearing thereafter. (Tr. 76-83, 86-88). A hearing was held on September 26, 2016, before ALJ Patrick J. McLean. (Tr. 21). During the hearing, Vocational Examiner ("VE") Annette Holder

3

testified, as did Gattah, who testified via translator, represented by Karen Lopatron. (Tr. 37). The ALJ issued an Unfavorable Decision on January 12, 2017, and Gattah timely requested review on March 1, 2017. (Tr. 18-32, 139). The Appeals Council denied his appeal on October 24, 2017, and he timely filed the instant suit thereafter. (Tr. 1-6).

### B. The ALJ's Application of the Framework for Disability Determinations

Under the Act, SSI benefits are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at \*7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following the five-step sequential analysis, the ALJ found that Gattah is not disabled under the Act. At Step One, the ALJ found that Gattah had not engaged in substantial gainful activity since his application date. (Tr. 23). At Step Two, the ALJ found that Gattah has the following severe impairments: depressive disorder and generalized anxiety disorder. (*Id.*). At Step Three, the ALJ found that Gattah's impairments, when considered alone or in combination, did not meet or medically equal the severity of a listed impairment. (Tr. 23-26). The ALJ then assessed Gattah's residual functional capacity ("RFC"), concluding that he is capable of performing a full range of work at all exertional levels but with the following non-exertional limitations: he must avoid all use of hazardous moving machinery, exposure to unprotected heights, cannot climb ladders, ropes, or scaffolds, he is limited to simple, routine, and repetitive tasks without any independent judgment or decision making required, free of fast paced production requirements with few, if any, workplace changes; he cannot interact with the public or co-workers, and he can only occasionally interact with supervision, and no jobs that require understanding, speaking, writing, or reading English. (Tr. 26-28). At Step Four, the ALJ found that Gattah has no past relevant work. (Tr. 29). At Step Five, considering Gattah's age, education, work experience and RFC, the ALJ found there are jobs that exist in significant numbers in the national economy that

5

he can perform. (Tr. 29-30). As a result, the ALJ concluded that Gattah is not disabled under the Act. (*Id.*).

**E.     Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Robbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, *supra* at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, *supra* at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in

this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

**F.    Analysis**

In his summary judgment motion, Gattah argues that the ALJ's decision is not supported by substantial evidence because the ALJ erroneously determined that he does not have an impairment that meets Listing 12.05B. For the reasons set forth below, the Court finds that this argument has merit, and remand is appropriate for that reason.[1]

   1. *The ALJ's Step Three Finding is Not Supported by Substantial Evidence*

---

[1] Gattah also argues that the ALJ's credibility finding is not based on substantial evidence, and that the Commissioner failed to sustain her burden of establishing there is other work in the national economy that Gattah could perform. Because the Court is recommending remand as to the ALJ's Step Three analysis, it need not address the merits of these other two arguments. However, considering Gattah's argument that the ALJ's hypothetical questions to the VE did not accurately reflect his limitations, on remand, the ALJ is instructed to carefully encompass all of Gattah's limitations in the hypothetical questions to the VE.

At Step Three, the ALJ concluded that "[t]he severity of [Gattah's] mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 [Affective Disorders], 12.05 [Intellectual Disability], and 12.06 [Anxiety Related Disorders]." (Tr. 23). The ALJ's decision regarding the "paragraph B" criteria of Listing 12.05 (Intellectual Disability) is primarily at issue here; specifically, whether Gattah has a valid verbal, performance, or full-scale IQ of 59 or less. (*See* Docs. #14-1 at 16, #15 at 8).

Listing 12.05 provides,

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.,* the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A,B,C, or D are satisfied.
> …
> B. A valid verbal, performance, or full scale IQ of 59 or less;

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(B) (2016).

If a person's impairment is found to meet or "medically equal" a listing at Step Three, he is determined to be disabled; no more analysis is necessary. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).

Here, the ALJ determined "[Gattah] does not have a valid, verbal, performance, or full scale IQ of 59 or less," explaining, in relevant part,

> Intellectual testing was administered by consultative psychological examiner, Nick Boneff, Ph.D., in April 2015, which yielded a full scale IQ score of 42. Dr. Boneff noted that no prior test data was available for comparison purposes, but [Gattah] did appear to put forth adequate effort on the testing so it appeared that the results represented a valid and accurate measure of his intellectual functioning. However, Dr. Boneff also indicated that [Gattah] appeared to have no idea at all of what he was being asked to do during the testing situation, he did not know the date, and he could not even provide the month or year, which significantly, diverges from his presentation during a consultative psychiatric examination that was performed by Himaja

8

> Gummadi, M.D., just 2 months prior in February 2015 where he was oriented to time place and person, and he could repeat 3 digits forward and backwards, recall 3 out of 3 objects immediately, recall 2 out of 3 objects after a few minutes, name the current President of the United States, and recite his birthdate.
>
> In May 2015, the State agency referred this matter to the Cooperative Disability Investigations Unit of Detroit, Michigan (CDI) to evaluate the possibility of malingering as the IQ testing was not supported by other medical evidence in the record.
> …
> The State agency determined that the preponderance of the evidence did not show fraud or similar fault in August 2015, but psychological consultant, Rose Moten, Ph.D., concluded that the IQ testing was not supported by other medical evidence in the file and she opined that he retained the capacity for simple, repetitive work activity that did not involve independent judgment, decision making, or interaction with co-workers and the public. The subsequent evidence shows that the claimant established care with a mental health provider in November 2015 and he has been receiving psychiatric treatment since that time, but no further intellectual testing has been administered and there are no documented objective findings that would support the validity of the aforementioned IQ score or a diagnosis of intellectual disability.

(Tr. 25).

Relying primarily on *Dragon v. Comm'r of Soc. Sec.*, 470 Fed. Appx. 454, 462 (6th Cir. 2012), and an assertion that "recent evidence from Eastwood Clinics contains key evidence supporting Dr. Boneff's IQ testing," Gattah argues that substantial evidence does not support the ALJ's rejection of his I.Q. test. (Doc. #14-1 at 17-22). As discussed below, the Court concurs with Gattah.

The ALJ's Step Three analysis is flawed in numerous respects, rendering his decision unsupported by substantial evidence. For example, although the ALJ writes, "there are no documented objective findings that would support the validity of the aforementioned IQ score or a diagnosis of intellectual disability" (Tr. 25), this is simply incorrect. First, there are multiple diagnoses of intellectual disability, intellectual delay, and cognitive/mental impairment in the

9

record. (Tr. 300, 303, 309, 315, 318, 321, 324-25, 327). Beginning November 5, 2015, and continuing throughout 2016, Gattah received mental health treatment from Eastwood Clinics. (Tr. 295-327). The Eastwood Clinics' treatment notes, which contain Gattah's diagnoses, were written and submitted *after* Gattah's I.Q. test was administered in April 2015. (Tr. 290, 195-327). The ALJ did not sufficiently explain these records' impact on the I.Q. score's validity.[2]

Second, the ALJ's statement that "there are no objective findings that would support the validity of the aforementioned IQ score" is inaccurate, as it ignores record evidence to the contrary. Here, the ALJ again fails to acknowledge multiple portions of Gattah's recent mental health records that at least arguably support the I.Q. test results. For example, on November 5, 2015, an assessment of Gattah's mental abilities states, "[h]is age doesn't ma[t]ch his cognitive process," he has poor concentration, thought content is poor, poor judgment, he is "mentally delayed," his short-term memory is defected, his long-term memory is defected, his intelligence is below average, his insight is fair/poor, his mood/affect is anxious, and his motivation during the examination was good. (Tr. 296). Under "Impression/Diagnostic Formulation," the notes read, in relevant part, "[Gattah] born with mental delay. Retardation. [ ] has no prior history of mental health treatment," and diagnoses of "Mental/cognitive development problem" and generalized anxiety. (Tr. 298).

---

[2] The ALJ does address these treatment notes later in his decision, within his RFC analysis. (Tr. 27). However, at no point does he acknowledge the diagnoses of intellectual disability and cognitive impairment within these notes, which directly contradicts his statement that no such diagnoses exist. Further, his characterization of these notes in the RFC section is questionable, as he writes that Gattah's "most recent treatment report from August 2016 also documents ongoing improvement with decreased symptoms and he remained completely normal from an objective standpoint." (Tr. 27). While the Eastwood Clinic notes reflect that Gattah's conditions improved with treatment, nowhere did they indicate Gattah "remained completely normal from an objective standpoint." Indeed, while the ALJ cites some "fair," and "good" findings, the same records contain many "poor" and "defected" findings. At a minimum, the ALJ should address this competing evidence more directly in the context of his Step Three analysis.

10

A diagnostic psychiatric evaluation conducted on February 29, 2016 reads, in relevant part,

> [Gattah] had [history] of febrile sz [seizures] at age 6M and then had intellectual developmental delay & delayed milestone & was put in special eds at elementary school & poor academic achievement, was traumatized by bombings & traumatic war event in Iraq. Fearful & scared, hear voices, guns & shooting, get scared & get fearful & think that the bullets will hit him, not sleep, not socializ[ing], not engaged, poor general knowledge, poor judgment, need help in ADL…

(Tr. 306).

Gattah was then prescribed three different medications, and diagnosed with psychosis, PTSD, and moderate intellectual development "D" (which could be either delay or disability). (Tr. 309). Gattah's medication was altered on April 11, 2016, with some medication being increased, and additional medication added to his regimen. (Tr. 305). On June 6, 2016, Gattah was, again, diagnosed with moderate intellectual disability and psychosis, although it was noted that he "feel[s] better than before." (Tr. 318). All of this recent record evidence constitutes at least *some* objective evidence supporting Gattah's intellectual disability, which directly contradicts the ALJ's statement that *no* such evidence exists.

Relatedly, the ALJ failed to acknowledge portions of Dr. Gummadi's consultative examination from February 2015 that appear to support the I.Q. test results obtained by Dr. Boneff. The ALJ relied heavily on the difference between Gattah's orientation during the February 27, 2015 exam and the April 29, 2015 I.Q. test (Tr. 25); however, in Step Three, the ALJ does not explore, in adequate detail, how that discrepancy outweighs the consistencies in the two examinations. For example, Dr. Gummadi opined that Gattah "IS NOT able to manage the benefit of funds," which mirrors Dr. Boneff's conclusions that "In light of the low level of cognitive function displayed today, [Gattah] is currently not [ ] capable of managing his own benefit funds." (Tr. 286, 291). Dr. Gummadi also found that Gattah "seemed to be unable to take care of his basic needs of food, clothing and shelter. He cannot comprehend information and cannot follow

11

directions on food boxes to make something to eat." (Tr. 284). Dr. Gummadi further opined that Gattah "had limited contact with reality," "Some psychomotor retardation was present," and he had cognitive limitations, including difficulty understanding, retaining and following instructions. (Tr. 285). These opinions, along with the opinion of a treating mental health provider that Gattah needed help with activities of daily living, (Tr. 306), call into question the ALJ's Step Three analysis, as they would seem to belie the ALJ's determination that Gattah's I.Q. test results were invalid.[3]

Finally, Dr. Gummadi opined that Gattah had a GAF ("Global Assessment Functioning") of 40, signifying "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant), OR major impairment in several areas such as work, or school, family relations, judgment, thinking, or mood." (Tr. 286, *Diagnostic and Statistical Manual of Mental Disorders-Fourth Edition* ("DSM-IV") 32 (4th ed. 1994)). The ALJ recognized this GAF score briefly in his RFC analysis, but did not acknowledge it in Step Three, when determining I.Q. test's validity. Further, the ALJ dismissed the GAF score as "provid[ing] little value for assessing his sustained level of functioning because [his GAF scores] refer to his symptom severity or his level of functioning at the particular moment they were assigned." (Tr. 28). However, this reasoning is suspect because the ALJ fails to explain why he assigned great weight to Gattah's ability to be oriented during Dr. Gummadi's examination, but afforded only limited weight to Dr.

---

[3] While an ALJ may consider the entire record without specifically referencing each and every piece of evidence in it, *Kornecky*, 167 F. Appx' at 508, in this case, the ALJ's failure to address the significant competing evidence described herein precludes a finding that the ALJ's analysis is supported by substantial evidence. *See Minor v. Comm'r of Soc. Sec.*, 2013 WL 264348, at *17 (6th Cir. Jan. 24, 2013); *Roberts v. Colvin*, 2015 WL 181658, at *10 (E.D. Mich. Jan. 14, 2015) (noting that while ALJ need not discuss all record evidence, "the quality and volume of evidence not discussed by the ALJ may 'raise[] serious doubts about the supportability of the ALJ's RFC finding' and overall conclusions") (quoting *Wilcox v. Comm'r of Soc. Sec.*, 2014 WL 4109921, at *7 (E.D. Mich. Aug.19, 2014)).

12

Gummadi's GAF assessment, when both arguably are indicative of Gattah's condition only on the examination's date. At the very least, the ALJ should have addressed or explained this inconsistency.

The ALJ's decision to invalidate the I.Q. test is flawed in other respects. As mentioned previously, the ALJ relied on Dr. Rose Moten's conclusion "that the IQ testing was not supported by other medical evidence in the file." (Tr. 25). Gattah now argues that "the ALJ erred in placing any reliance on the outdated assessment of Dr. Moten, a State agency non-examining psychologist, who reviewed this case on August 21, 2015, prior to the addition of significant supporting evidence from Eastwood Clinics documenting Mr. Gattah's mental health treatment starting in November 2015." (Doc. #14-1). The Court agrees.

First, as Gattah points out, Dr. Moten reviewed Gattah's case file on August 21, 2015, several months before he began treatment at Eastwood Clinics. (Tr. 68, 300-318). Dr. Moten, therefore, clearly did not review the most up to date mental health treatment notes from November 2015 through 2016, which constitute relevant, objective evidence. *See supra* at 10-12. While there is certainly no requirement that a consulting physician's review be performed after the medical record is complete, here, where the review predated significant mental health treatment records that arguably support the I.Q. test results, the ALJ erred in relying on the physician's opinion without acknowledging and properly weighing its limitations in light of the newer records. As Gattah argues, the extent to which a medical source is familiar with the evidence of record is a relevant factor to consider in determining the weight to accord the opinion. (*See* 20 C.F.R. § 404.1527(c)(6)).

Second, the ALJ neglected to mention portions of Dr. Moten's analysis that provide necessary context to her opinion that the I.Q. testing was not supported by Gattah's case file. For

13

example, Dr. Moten wrote, "[t]here is no longitudinal history to support a cognitive impairment," "[Gattah] is not engaged in outpt tx," and "investigation is needed to determine the claimants [sic] true functioning." (Tr. 68). The mental health treatment records submitted after Dr. Moten reviewed his file directly respond to the foregoing concerns that the record was incomplete, and there was no indication of outpatient treatment. Yet, in relying on Dr. Moten's opinion, the ALJ failed to acknowledge this fact.

Moreover, the reasons articulated by the ALJ do not constitute substantial evidence to support his decision to wholly reject the I.Q. test. The above-mentioned mischaracterizations of the record evidence, improper reliance on Dr. Moten's outdated opinion, and total rejection of Dr. Boneff's opinion that the I.Q. test results were "valid and accurate" with no supporting, up to date, examining medical opinion call into question the ALJ's analysis, and remand is therefore appropriate. This approach is consistent with relevant case law, as courts reject an ALJ's conclusion that an I.Q. score is invalid when such a finding is inconsistent with a doctor's full evaluation. *See, e.g., Dragon v. Comm'r of Soc. Sec.,* 470 Fed. Appx. 454, 462 (6th Cir. 2012); *Henderson v. Comm'r of Soc. Sec.*, No. 13-11503, 2014 WL 3827227, at *12 (E.D. Mich. Aug. 4, 2014), *report and recommendation adopted in superseded order*, No. 13-11503, 2014 WL 3864568 (E.D. Mich. Aug. 5, 2014). In *Dragon v. Comm'r of Soc. Sec.,* the Sixth Circuit found the ALJ's decision to invalidate the claimant's I.Q. scores was unsupported by substantial evidence. When deciding to invalidate the I.Q. score in *Dragon*, the ALJ heavily relied upon the examining psychologist's statement that Dragon's tested I.Q. was lower than expected. (*Dragon v. Comm'r of Soc. Sec., supra* at 462). Finding error in the ALJ's analysis, the Sixth Circuit explained that an "ALJ may choose to disregard I.Q. scores that would normally lead to a finding of disability when those scores were undermined by a doctor's full evaluation," but, determined

14

that the full evaluation at issue "served to reinforce the I.Q. scores, rather than undermine them." (*Id.*).

This Court relied on *Dragon* when deciding *Henderson*, No. 13-11503, 2014 WL 3827227. In *Henderson*, this Court found the ALJ erred in disregarding the results of I.Q. testing "where no medical or psychological evaluation undermines Dr. Van Horn's test results [the I.Q. score] and, indeed, her own evaluation [ ] clearly reinforces them." *Id.* at *12. The same is true here. The I.Q. test administrator, Dr. Boneff, opined that the test was "valid and accurate," subsequent mental health treatment records support a diagnosis of intellectual disability, and no full evaluation undermined its validity. As mentioned previously, although there were some discrepancies in Gattah's condition from Dr. Gummadi's February 2015 evaluation to Dr. Boneff's I.Q. test, there were also multiple consistencies, which were not adequately considered by the ALJ. Further, no doctor who reviewed all the record evidence opined that Gattah's I.Q. test results were invalid, and subsequent medical examiners who diagnosed Gattah with intellectual disability tend to support his limited I.Q. score, rather than undermine it. Applying the reasoning and holding of both *Dragon* and *Henderson*, remand is appropriate here. *See also Miles v. Comm'r of Soc. Sec.*, No. 1:16-CV-440, 2017 WL 1026002, at *11 (S.D. Ohio Mar. 16, 2017), *report and recommendation adopted,* No. 1:16CV440, 2017 WL 1410815 (S.D. Ohio Apr. 19, 2017).

The Commissioner cites no responsive case law in which the ALJ relies simply on his own decision to reject the validity of an I.Q. test, with no accompanying medical opinion suggesting the I.Q. test in question is invalid. (*See* Doc. #15 at 11). Instead, the Commissioner cites *Townsend v. Comm'r of Soc., Sec. Admin.* for the proposition that "evidence of malingering, or of failure to give full effort on intelligence testing, can show that I.Q. scores are invalid." *Id.* (citing No. 1:12CV2982, 2014 WL 809516, at *11 (N.D. Ohio Feb. 28, 2014)). But *Townsend* is

15

distinguishable from this case. In *Townsend*, the examining doctor himself suspected malingering, and the doctor explicitly opined that the I.Q. scores "were suspect because [the plaintiff] did not try his hardest on the test." (*Id.* at \*2). Here, in contrast, the examining doctor, Dr. Boneff, opined that "[Gattah] did appear to put forth adequate effort on the testing," and further opined, "today's results do represent a valid and accurate measure of his current intellectual functioning." (Tr. 290). Further, there is a distinction between an examining and reviewing doctor. *See* 20 C.F.R. § 416.927 ("Generally, we give more weight to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.").

The Commissioner next argues that "[t]he ALJ did not have to accept Dr. Boneff's opinion that [Gattah] had put forth adequate effort in intelligence testing, given that Dr. Boneff was not familiar with other, inconsistent, evidence in [Gattah's] case record," citing 20 C.F.R. §416.927(c)(6)(2016). However, the Commissioner never specifies the "other, inconsistent, evidence" that Dr. Boneff was allegedly not familiar with, and the Court notes that Dr. Boneff indicated on his report that his evaluation included a "review of records." (Tr. 290). Further, the ALJ did not delve into this analysis in his decision, so the Court will not speculate as to how it may or may not alter his Step Three analysis.

Finally, the ALJ's Listing 12.05B analysis of the CDI investigation completed in July 2015 does not lend substantial evidence to his overall decision. (Tr. 25). First, as the ALJ acknowledged, the State agency determined that the preponderance of the evidence did not show fraud or similar fault. (Tr. 25). Indeed, the CDI investigators noted that "[Gattah] had excessive salivation around his mouth, [] stood with an odd posture, [] did not maintain eye contact, [] interrupted his brother's responses, [] had difficulty maintaining focus and concentration, and [] could understand and speak English, but he could not formulate proper sentences." (Tr. 25). While

16

the ALJ noted certain minor discrepancies arising from the agents' conversation with the leasing manager of Gattah's parent's townhouse regarding Gattah's interactions with staff there, ultimately, the staff reported to the CDI investigator that "there was something wrong with [Gattah]." (*Id.*, Tr. 197).

For all of the reasons discussed above, the ALJ's reliance on Dr. Moten's opinion to undermine the validity of Gattah's I.Q. test is not supported by substantial evidence.[4] Moreover, the Court cannot find that this error was harmless. "An error will be deemed harmless where concrete factual and medical evidence is apparent in the record and shows that even if the ALJ had made the required findings, the ALJ would have found the claimant not disabled." *Zarkowski v. Comm'r of Soc. Sec.*, No. 14-10742, 2015 WL 2342982, at *11 (E.D. Mich. May 14, 2015) (internal citations omitted). "If, on the other hand, the evidence is of such a nature that the Court cannot glean how the ALJ would have ruled, the error is not harmless, and the case must be remanded so that the ALJ may evaluate the issue in the first instance." (*Id.*). Here, the Court cannot glean how

---

[4] The Commissioner's reference to records that the ALJ did not mention in her decision does not change the analysis. (Doc. #15 at 9-10). First, the citation of such evidence constitutes improper, appellate-level post hoc rationalization. *See Keeton v. Comm'r of Soc. Sec.,* 583 Fed.Appx. 515, 524 (6th Cir. 2014) ("In reviewing an ALJ's findings and conclusions, this Court shall not 'accept appellate counsel's *post hoc* rationalization for agency action in lieu of accurate reasons and findings enunciated by the [agency].'") (quoting *Hyatt Corp. v. N.L.R.B.,* 939 F.2d 361, 367 (6th Cir. 1991)); *Beckrow v. Commissioner of Soc. Sec.*, 2012 WL 1564669, at *12 (E.D. Mich. Apr. 12, 2012) ("post hoc rationalization at this stage is insufficient") (internal quotations omitted); *Allen v. Berryhill*, 273 F. Supp. 3d 763, 774 (M.D. Tenn., 2017) (The Court "'may not accept appellate counsel's post hoc rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'") (quoting *Berryhill v. Shalala*, 4 F.3d 993, 1993 WL 361792, at *6 (6th Cir. Sept. 16, 1993)). Second, some of the evidence is of questionable value, highlighting the need for the ALJ to weigh it in the first instance. For example, the Commissioner noted that during his I.Q. test, Gattah reported never having worked in the U.S., but that he testified at the hearing that he worked briefly as a bagger before being fired. (Doc. #15 at 9 n.4). Again, it is up to the ALJ to determine whether, when weighed against the whole record, including Gattah's earnings records which show he earned a total of about $800 over the course of 15 years, the discrepancy is of any value.

17

the ALJ would have ruled had he properly addressed the issues discussed above. Accordingly, remand is required so that the ALJ may consider those issues.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is not supported by substantial evidence, and that remand is appropriate.

### III.  CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment (Doc. #15) be DENIED, Gattah's Motion for Summary Judgment (Doc. #14-1) be GRANTED IN PART to the extent it seeks remand, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be REMANDED to the ALJ for further proceedings consistent with this Report and Recommendation.

Dated: January 2, 2019  
Ann Arbor, Michigan

s/David R. Grand  
DAVID R. GRAND  
United States Magistrate Judge

### NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have. *See Smith v. Detroit Fed'n of Teachers Local 231*, 829

F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.